## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## VALDOSTA, GEORGIA

| | | |
|---|---|---|
| RBW LOGISTICS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Civil Action File No. |
| ARGLASS YAMAMURA SE, LLC | ) | 7:22-cv-00059-HL |
| | ) | |
| Defendant. | ) | |
| ——————————————————— | ) | |

### ARGLASS YAMAMURA SE, LLC'S ANSWER, DEFENSES, AND COUNTERCLAIMS

Under Fed. R. Civ. P. 12(a), Defendant Arglass Yamamura SE, LLC

("Arglass") respectfully submits its Answer, Affirmative Defenses, and

Counterclaims in response to Plaintiff RBW Logistics Corporation's ("RBW")

Complaint.[1]

### PARTIES, JURISDICTION AND VENUE

1.     Plaintiff, RBW Logistics Corporation, is a Georgia corporation with its principal place of business in Augusta, Georgia.  RBW is a domestic provider of warehousing and logistics services within the state of Georgia.

**RESPONSE: Arglass admits that RBW Logistics Corporation is a Georgia corporation.  Arglass is otherwise without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 1 and therefore denies them.**

2.     Defendant, Arglass Yamamura SE, LLC is a Delaware limited

---

[1] Arglass timely and properly removed this case from the Superior Court of Lowndes County on June 23, 2022 [Dkt. 1].

liability company registered to do business in this State with its principal place of business in Valdosta, Georgia.  Arglass is a manufacturer of glass bottles for international distribution within the food and beverage industry and may be served through its agent for service of process C T Corporation System, 289 S Culver St, Lawrenceville, GA, 30046-4805.

**RESPONSE: Admitted.**

3.      Arglass has consented to personal jurisdiction within the State of Georgia by registering to do business in this State and also by contractually agreeing that jurisdiction and venue shall be proper in this State.

**RESPONSE: Arglass states that ¶ 3 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, Arglass does not contest for this case that the United States District Court for the Middle District of Georgia has personal jurisdiction over it and that venue is proper there.  Arglass further admits that the parties consented to this jurisdiction in ¶ 23(d)(ii) of the parties' June l, 2021 Master Services Agreement (the "Agreement").  Arglass denies any remaining allegations in ¶ 3.**

4.      Venue is proper in this Court pursuant to O.C.G.A. § 14-2-510(b)(l) and (2).

**RESPONSE: Arglass states that ¶ 4 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, Arglass does not contest that venue in proper in the United States District Court for the Middle District of Georgia. Arglass denies any remaining allegations in ¶ 4.**

## FACTUAL ALLEGATIONS

### A.      The negotiation and execution of the Agreement

5.      On or about February 2, 2021, Arglass published and issued a Request for Proposal (the "RFP") in which it solicited bids from service providers such as RBW for the provision of certain managed warehouse operations within the Arglass plant located in Valdosta, Georgia (the "Facility").

**RESPONSE: Arglass admits that it created a Request for Proposal ("RFP")**

**dated February 2, 2021 in connection with its search for a third party to operate, with its own equipment and systems, Arglass's warehouse within its Valdosta, GA plant; the RFP is a written document that speaks for itself. Arglass denies any remaining allegations in ¶ 5.**

6.      In the RFP, Arglass represented that it would provide approximately 190,000 square feet of warehouse space within the Plant and require approximately 758,918 pallet moves of finished goods per year.

**RESPONSE: Arglass admits that the RFP states that Arglass will provide approximately 190,000 square feet of warehouse space within the plant. Arglass denies that the RFP indicated that there would be approximately 748,918 pallet moves of finished goods per year and denies any remaining allegations in ¶ 6.**

7.      Arglass needed a warehouse manager to make internal movements of these pallets and load and unload trucks (excluding the unloading of raw materials) and made clear in the RPF that it "expects" bidders to perform these operations within the Facility using "unmanned vehicles (automated guided vehicles, 'AGVs')."

**RESPONSE: Arglass admits that the RFP sought a third-party service provider interested in "installing and operating an in-house managed warehouse operation." The provider was "expected to handle all aspects related to the movements of all materials in the warehouse including truck loading and unloading"; the RFP is a written document that speaks for itself. Arglass denies any remaining allegations in ¶ 7.**

8.      Because Arglass had already purchased AGVs from Canon (Arglass' previous warehouse service provider), it required bidders to purchase these AGVs from Arglass for use in the Facility.

**RESPONSE: Arglass admits that, in connection with contracting with RBW to provide warehouse management services, it invited RBW to purchase in an arms-length transaction AGVs previously owned by Canon for use in the plant. Arglass denies any remaining allegations in ¶ 8.**

9.      On or about June l, 2021 RBW and Arglass entered into a Master Services Agreement (the "Agreement"), wherein RBW was to provide warehouse services (the "Services") within the Facility.

3

**RESPONSE:** **Arglass admits that it entered into a June 1, 2021 Master Services Agreement ("Agreement") with RBW through which RBW, among other obligations, was obligated to provide warehouse management services; the Agreement is a written document that speaks for itself.  Arglass denies any remaining allegations of ¶ 9.**

10.    Prior to entering into the Agreement, information was exchanged between RBW and Arglass regarding the scope of the services to be provided, the anticipated volume of products for storage and fulfillment, and the length of the term of the Agreement.

**RESPONSE:** **While Arglass admits that it held discussions and exchanged information with RBW before entering into the Agreement, Arglass presently lacks knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 10 and therefore denies them.  Arglass also states that the Agreement contains an entire agreement term at ¶ 23(A), which speaks for itself.**

11.    In these precontractual exchanges, Arglass reiterated, among other things, that (1) it expected to require approximately 758,918 pallet moves of finished goods per year, (2) RBW would be required to purchase the AGVs and other ancillary equipment from Arglass for use in the Facility, and (3) Arglass had or would soon have the technological infrastructure necessary to permit RBW to use the AGVs and ancillary equipment to provide the Services.

**RESPONSE:** **While Arglass admits that it held discussions and exchanged information with RBW before entering into the Agreement, Arglass denies that it represented that it would supply the technological infrastructure for RBW to use the AGVS. Arglass presently lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 11 and therefore denies them.  Arglass also states that the Agreement contains an entire agreement term at ¶ 23(A), which speaks for itself.**

12.    In Exhibit F to the Agreement, the parties entered into an Equipment Purchase and Sale Agreement in which the parties agreed that Arglass would sell certain equipment, which included the AGVs, to RBW.  The list of equipment described in Exhibit F to the Agreement is hereinafter referred to as the "Equipment."

4

**RESPONSE: Arglass admits that Exhibit F is an attachment to the Agreement entitled Equipment Purchase and Sale Agreement, which is a written document that speaks for itself.  Arglass denies any remaining allegations of ¶ 12.**

13.    The Agreement provided that this Equipment "shall" be used by RBW in providing the Services in the Facility.

**RESPONSE: Arglass admits that Exhibit F of the Agreement states, "Buyer wishes to purchase the Equipment for Buyer to use in performing services under the MSA," and admits that the Agreement is a written document that speaks for itself.  Arglass denies any remaining allegations of ¶ 13.**

14.    The value of the Equipment purchased in the Agreement was $1,916,395.00.

**RESPONSE: Denied.**

15.    However, Arglass desired to increase the sale price of the Equipment by $513,759.00 (the "unsecured financial investment") in order to recoup additional expenses Arglass owed to Canon.

**RESPONSE: Denied.**

16.    The parties therefore agreed that the sale price of the Equipment would be increased by $513,759.00 to $2,430,154.00.

**RESPONSE: Arglass admits that Exhibit F to the Agreement states, "The purchase price for the Equipment shall be $2,430,154.00." Arglass denies any remaining allegations in ¶ 16.**

17.    At the time the Agreement was executed, Arglass was aware that RBW's sole reason for purchasing the Equipment was to perform services at the Facility pursuant to the Agreement.

**RESPONSE: Arglass admits that it agreed in Exhibit F to the Agreement that "Seller wishes to sell, and Buyer wishes to purchase the Equipment for Buyer to use in performing services under the MSA." *See* Pmbl.  Arglass further admits that it expected RBW to successfully use the Equipment, and any other necessary equipment, to fulfill its warehouse management and other**

obligations under the Agreement.  Arglass denies any remaining allegations in ¶ 17.

18.     At the time the Agreement was executed, Arglass was aware that the Equipment was highly specialized such that it had no value to RBW other than for use in the Facility.

**RESPONSE: Denied.**

19.     Because Arglass required RBW to purchase the Equipment for more than its purchase price, and aware RBW would finance the purchase of the Equipment, Arglass agreed to a guaranteed repayment provision which provided that:

> Additionally, the Parties agree that $0.136 per pallet move was factored into the per pallet move rates, to account for an unsecured financial investment .... For the avoidance of doubt, in the event of Termination for any reason other than an uncured material RBW default, Arglass shall, if applicable, promptly pay RBW the difference between 6,183,734 and actual moves billed at the time of Termination, at the rate of $0.136 per pallet move.
> *See* Agreement, Ex. A, Section 13.

**RESPONSE: Arglass admits that ¶ 19 quotes an excerpt of the Agreement and invites the Court to review the Agreement for the complete content and context.  Arglass denies any remaining allegations of ¶ 19.**

20.     This provision ensured RBW would be paid $840,987.82 over the life of the Agreement which would repay it for making the unsecured financial investment including the interest RBW anticipated incurring as a result of financing the unsecured financial investment.

**RESPONSE: Denied.**

21.     Additionally, in order to induce RBW to enter into the Agreement, Arglass "agree[d] that the minimum quarterly revenue generated by RBW for providing the Services will be two hundred thousand dollars ($200,000)." *See* Agreement, Ex. A, Section 13.

**RESPONSE: Arglass admits that ¶ 21 quotes an excerpt of the Agreement and invites the Court to review the Agreement for the complete content and context.  Arglass denies any remaining allegations of ¶ 21.**

22.    This minimum quarterly revenue guarantee helped ensure that RBW recouped its monthly fixed costs associated with providing the Services under the Agreement.

**RESPONSE: Denied.**

23.    Recognizing that it would take some time to install and integrate the Equipment, the parties agreed that during the first eight weeks when the Services were not yet automated (the "Startup Period"), RBW would be compensated pursuant to a schedule of hourly rates termed "Accessorial Charges". The Startup Period was agreed upon based on Arglass' representations that the infrastructure was mostly in place to fully integrate the Equipment. Once the Startup Period ended, the warehouse functions would be largely automated through the use of the AGVs and the Equipment and RBW would thereafter be paid under a "Transactional Pricing'' fee schedule.

**RESPONSE: Arglass admits that the parties included a "Startup Period," "Accessorial Charges," "Transactional Pricing," and related terms in the Agreement, which is a written document that speaks for itself. Arglass also states that the Agreement contains an entire agreement term at ¶ 23(A), which speaks for itself. Arglass further admits that the Agreement required RBW to successfully operate the warehouse using AGVs, which it was never able to do. Arglass denies any remaining allegations of ¶ 23.**

24.    Providing the Services in an automated Facility using properly installed and fully operational Equipment would be both cheaper and more profitable for RBW. The more pallet moves, the greater the profit for RBW, and the sooner it would recoup the investments it made as a result of entering into the Agreement.

**RESPONSE: Arglass is without knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 24 and therefore denies them.**

### B.    Arglass' obligations under the Agreement

25.    In the Facility, Arglass manufactured glass bottle products (the "Goods") which would be shrink-wrapped and delivered to a point within the Facility for RBW to move, store, and eventually load for shipment to Arglass customers.

**RESPONSE**: **Arglass admits that among RBW's obligations under the Agreement, RBW was required to successfully move, store, and load for shipment pallets of glass bottle products within Arglass's plant.  Arglass denies any remaining allegations of ¶ 25.**

26.     The Equipment RBW was required to use involved radio frequency identification ("RFID"), which when deployed, would permit the AGVs to navigate the Facility, identify the pallets to move, and move them to the proper location.

**RESPONSE**: **Arglass admits that the Agreement required RBW to use its advertised expertise to decide how to successfully manage the warehouse. Among other things, the Agreement required RBW to provide the "right equipment, and the right number of units, including Automated Guided Vehicles (AGVs)" and the "right level of IT infrastructure (hardware and software) to provide the services and communicate with Arglass' systems in a seamless and efficient manner."  Arglass denies any remaining allegations of ¶ 26.**

27.     In order for the Equipment to provide the Services autonomously, Arglass' software system needed to be able to communicate with the warehouse management system ("WMS") RBW was contractually required to use.  If Arglass did not utilize a software system that could communicate with the WMS, then Arglass could not provide the WMS, and by extension RBW and its Equipment, with the necessary data to know where pallets are located, where they need to go, and what must be done with them.

**RESPONSE**: **Arglass admits that under the Agreement "RBW will provide integral Warehouse Management Services ('WMS') to Arglass."  Arglass further admits that the Agreement required RBW to use its purported expertise to decide how to successfully manage the warehouse.  Among other things, the Agreement required RBW to provide the "right level of IT infrastructure (hardware and software) to provide the services and communicate with Arglass' systems in a seamless and efficient manner."  Arglass further admits that under the Agreement "RBW shall also provide . . . the integration of communication of information with Arglass' own information systems and equipment."  Arglass denies any remaining allegations of ¶ 27.**

8

28.     Also in order for the Services to be provided using the Equipment, Arglass had to print labels that could be read by the RFID scanners, so that the Equipment would know the contents of each pallet and what to do with the goods contained on each pallet.

**RESPONSE: Arglass admits that under the Agreement, RBW was responsible for providing the "right level of IT infrastructure (hardware and software) to provide the services and communicate with Arglass' systems in a seamless and efficient manner."  Arglass denies any remaining allegations of ¶ 28.**

29.     In order for RBW to provide the Services under the Agreement, Arglass agreed to provide RBW with the use of a specifically designated area within the Facility.

**RESPONSE: Arglass admits that the Agreement provided for a "RBW Designated Warehouse Area" among other terms and that the Agreement is a written document that speaks for itself.  Arglass denies any remaining allegations of ¶ 29.**

30.     Arglass also agreed in Exhibit A, Section 15 of the Agreement to produce a specific volume of pallet moves of Goods per month.

**RESPONSE: Denied. The Agreement, which speaks for itself, contained estimated pallet moves, but it did not require Arglass to produce a specific volume of pallet moves of Goods per month.**

C.     **Arglass' breach of the Agreement**

31.     During the Startup Period, RBW established all the necessary technical solutions and identified the Arglass requirements that would permit the Equipment to operate properly and perform the Services in an automated fashion as contemplated by the Agreement.

**RESPONSE: Arglass admits that RBW was obligated to provide the "right equipment, and the right number of units, including Automated Guided Vehicles (AGVs)" and the "right level of IT infrastructure (hardware and software) to provide the services and communicate with Arglass' systems in a seamless and efficient manner."  Arglass is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations of ¶ 31, including what technical solutions RBW identified, and therefore denies them.**

32.    Arglass, however, failed to implement an infrastructure that would provide the necessary data as well as the system integration needed to transfer information to the WMS RBW was required to use under the Agreement.

**RESPONSE: Arglass admits that it was RBW's obligation under the Agreement to provide the "right equipment, and the right number of units, including Automated Guided Vehicles (AGVs)" and the "right level of IT infrastructure (hardware and software) to provide the services and communicate with Arglass' systems in a seamless and efficient manner." Arglass denies any remaining allegations of ¶ 32.**

33.    As a result, Arglass could not deliver the data necessary for the Equipment to perform the Services autonomously.

**RESPONSE: Denied.**

34.    Arglass also was unable to print labels that could be read by the RFID scanners called for under the Agreement.

**RESPONSE: Arglass admits that it was RBW's obligation under the Agreement to provide the "right equipment, and the right number of units, including Automated Guided Vehicles (AGVs)" and the "right level of IT infrastructure (hardware and software) to provide the services and communicate with Arglass' systems in a seamless and efficient manner." Arglass denies any remaining allegations of ¶ 34.**

35.    Arglass's inability to print labels that could be read by the RFID scanners meant that even if Arglass could transmit data to the WMS (which it could not) the Equipment would not know what to do with that data since the Equipment would not know the contents of each pallet.

**RESPONSE: Arglass admits that it was RBW's obligation under the Agreement to provide the "right equipment, and the right number of units, including Automated Guided Vehicles (AGVs)" and the "right level of IT infrastructure (hardware and software) to provide the services and communicate with Arglass' systems in a seamless and efficient manner." Arglass denies any remaining allegations of ¶ 35.**

36.    Between June 1, 2021 and January 5, 2022, at the request of Arglass

and pursuant to the Agreement, RBW provided the Services at the Facility.

**RESPONSE**: **Arglass admits that the Agreement was operative between June 1, 2021 and January 5, 2022 and that RBW was obligated to provide warehouse management services and all other responsibilities during this time under the terms of the Agreement.  Arglass denies any remaining allegations of ¶ 36.**

37.     For the first eight weeks, Arglass paid RBW in accordance with the Accessorial Charges.  However, by the end of the eight-week Startup Period, Arglass was unable to communicate with the WMS and therefore the Equipment was not fully implemented and/or integrated as contemplated by the Agreement.

**RESPONSE**: **Arglass admits that it paid RBW in accordance with the Accessorial Charges for the first eight weeks and that at the end of the eight-week Startup Period, RBW was unable to successfully operate the Equipment. Arglass further admits that it was RBW's obligation under the Agreement to provide the "right equipment, and the right number of units, including Automated Guided Vehicles (AGVs)" and the "right level of IT infrastructure (hardware and software) to provide the services and communicate with Arglass' systems in a seamless and efficient manner." Arglass denies any remaining allegations of ¶ 37.**

38.     Recognizing that it had not taken the steps necessary to permit the Equipment to become fully implemented and/or integrated, Arglass agreed to extend the Startup Period in which it would pay the Accessorial Charges through September 2021.

**RESPONSE**: **Arglass admits that the parties mutually agreed to extend the Startup Period through September 30, 2021.  Arglass denies any remaining allegations of ¶ 38.**

39.     Between June 1, 2021, and September 30, 2021, RBW attempted to search for solutions that would permit Arglass to transmit the data to the WMS necessary for the Equipment to become fully integrated and implemented but Arglass rejected all of the proposed solutions.

**RESPONSE**:      **Denied.**

40.     Upon information and belief, Arglass' IT manager believed that

expensive changes to Arglass' IT system would be needed in order to transmit the necessary data to the Equipment for it to function properly.

**RESPONSE: Denied. Arglass further states that it was RBW's obligation under the Agreement to provide the "right equipment, and the right number of units, including Automated Guided Vehicles (AGVs)" and the "right level of IT infrastructure (hardware and software) to provide the services and communicate with Arglass' systems in a seamless and efficient manner."**

41.    Upon information and belief, Arglass was not interested in making changes to its IT system due to the costs associated with the necessary changes and therefore terminated the IT manager rather than make changes. This was the second senior IT personnel Arglass had terminated during the relationship with RBW.

**RESPONSE: Denied.**

42.    Because Arglass was unable to transmit data to the WMS or the Equipment and unable to print labels that could be read by RFID, RBW was unable to transition to the cheaper automated system which would fully utilize the Equipment and permit it to bill Arglass at the more profitable Transactional Pricing.

**RESPONSE: Denied.**

43.    At the same time, Arglass insisted that RBW perform its work at the Transactional Pricing rate even though Arglass could not transmit the data or print labels that would permit RBW to fully utilize the Equipment.

**RESPONSE: Denied.**

44.    Arglass also failed to provide RBW with exclusive use of the area designated in the Agreement.

**RESPONSE: Arglass admits that the Agreement references an RBW designated area, and that Agreement speaks for itself.  Arglass otherwise denies the allegations of ¶ 44.  RBW used more space than designated in the Agreement, including placing holes in the ground without permission in the quality control area.**

45.     Arglass reserved approximately 30,000 square feet of the space designated for RBW for the use of TSCC Packaging, a wholly owned subsidiary of Arglass.

**RESPONSE: Arglass admits that TSCC Packaging is a wholly owned subsidiary of Arglass and denies any remaining allegations of ¶ 45.**

46.     By forcing RBW to operate in a more confined space, Arglass forced RBW to incur additional costs associated with the Services.

**RESPONSE: Denied.**

47.     Arglass also experienced production errors during the time RBW provided the Services, including but not limited to, failing to shrink wrap pallets of glass so that they could not be picked up without glassware breaking, printing and affixing duplicate labels, producing pallets without straps, conveyor belt errors that resulted in pallets being pushed off of the conveyor belt onto the floor and breaking the pallet contents, producing large amounts of non-performing glass ("cullet"), failing to properly label pallets, and pallets sticking to conveyor belts so that the belt does not push the pallet into a position for RBW to retrieve it.  These production errors increased RBW's costs, and also precluded the automated use of AGVs even if Arglass had been able to provide the necessary data for the Equipment to become fully implemented and integrated.

**RESPONSE: Arglass admits that in scaling up production in its new, state-of-the-art glass-manufacturing plant, it experienced production errors from time to time, including producing some glass bottles that did not meet Arglass's exacting quality standards and that Arglass recycled as cullet.  Arglass denies that sporadic production issues, which are part and parcel of *any* manufacturing plant, excused RBW's many failures or precluded RBW from implementing AGVs under the Agreement.  Arglass denies any remaining allegations of ¶ 47.**

48.     Because Arglass prevented RBW from integrating and implementing the Equipment, RBW incurred unnecessary excess expenses. Had RBW been able to switch over to automated Services and bill at the Transactional Pricing rates, it would have generated more profit.

**RESPONSE: Arglass denies the allegations in the first sentence of ¶ 48. Arglass is without knowledge or information sufficient to form a belief as to**

the truth of the allegations in the second sentence of ¶ 48 and therefore denies them.

49.     Additionally, the Agreement estimated Arglass would have a need for 758,918 moves each year.

**RESPONSE: Arglass admits that the Agreement estimated total annual pallet moves of 758,918.  The Agreement is a written document that speaks for itself. Arglass denies any remaining allegations of ¶ 49.**

50.     In the approximately six-month period RBW performed the Services, Arglass production problems limited RBW to merely providing 115,273 moves.

**RESPONSE: Denied.**

51.     Rather than invoice Arglass for these additional expenses, RBW opted to invoice Arglass at the Accessorial Charges rate, even though this rate would benefit Arglass and result in less profit for RBW.

**RESPONSE: Arglass admits that RBW purported to charge Arglass at Accessorial Charges rates beyond when it was entitled to do so under the Agreement.  Arglass denies that these excessive and improper charges for failed services provided benefit to Arglass commensurate with those charges. Arglass denies any remaining allegations of ¶ 51.**

52.     RBW issued invoices weekly to Arglass, who, under the Agreement, has 30 days to submit in writing any dispute about the invoice.

**RESPONSE: Arglass admits that RBW purported to issue weekly invoices at certain times, including excessive and improper charges for inefficient and ineffective services that Arglass disputed.  Arglass further admits that ¶ 2 of the Agreement contains a 30-day dispute-notice term, which is one of the many terms of the Agreement and speaks for itself.  Arglass denies any remaining allegations in ¶ 52.**

53.     Under the Agreement, Arglass may not offset payment of invoices under any circumstances without the prior written consent of RBW.

**RESPONSE: Arglass denies that such a provision bars any of its defenses or counterclaims. Arglass admits that further admits that ¶ 2 of the Agreement**

contains a no-offset provision, which is one of the many terms of the Agreement and speaks for itself. Arglass invites the Court to review the entire Agreement for a complete statement of its terms.

54.     RBW never provided written consent to offset payment of any of its invoices.

**RESPONSE: Arglass is without knowledge or information sufficient to form a belief as to the truth of the allegations of ¶ 54 and therefore denies them.**

55.     Since September 19, 2021, RBW has delivered 22 invoices to Arglass totaling $976,165.40.

**RESPONSE: Denied.**

56.     In these invoices, RBW continued to invoice Arglass using the Accessorial Charges rates, even though doing so resulted in less profit for RBW. Therefore, the unpaid invoices do not fully reflect RBW's damages resulting from Arglass preventing the use of automated Services.

**RESPONSE: Arglass admits that RBW continued to send purported invoices to Arglass using the Accessorial Charges rates, which included excessive and improper charges for inefficient and ineffective services.  Arglass denies any remaining allegations of ¶ 56.**

57.     Arglass did not dispute any invoices prior to October 31, 2021.

**RESPONSE: Denied.**

58.     Even though Arglass never disputed these invoices, Arglass has failed to pay the invoices submitted by RBW between September 19, 2021, and October 24, 2021.

**RESPONSE: Denied.**

59.     Following a December 17, 2021 meeting Arglass CEO Jose de Diego Arozamena confirmed in writing that Arglass would "be immediately paying any outstanding invoices prior to October 1 and any invoice that may be outstanding for airbags or similar consumables."

**RESPONSE: Arglass admits that Arglass CEO Jose de Diego Arozamena sent an email following a _settlement_ meeting between the parties on December 17, 2021 offering valuable consideration in a good-faith attempt to resolve the dispute before fully investigating Arglass' rights and remedies. RBW rejected that proposed compromise.  In any event, such negotiations and statements are inadmissible under Federal Rule of Civil Procedure 408.  Arglass denies any remaining allegations of 59.**

60.    Arglass did not tender the payment promised in the December 17, 2021 email.

**RESPONSE: Arglass admits that Jose de Diego Arozamena sent an email following a _settlement_ meeting between the parties on December 17, 2021 offering valuable consideration in a good-faith attempt to resolve the dispute before fully investigating Arglass' rights and remedies.  RBW rejected that proposed compromise. In any event, such negotiations and statements are inadmissible under Federal Rule of Civil Procedure 408.  Arglass denies any remaining allegations of 60.**

61.    For those invoices submitted on and after October 31, 2021, Arglass has claimed that it is entitled to pay the Transactional Pricing rates even though it has prevented the Equipment from becoming fully implemented and operational.

**RESPONSE: Arglass denies that it prevented RBW from successfully fulfilling its obligations under the Agreement or prevented any equipment from becoming fully implemented and operational.  Arglass is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 61 and therefore denies them.**

62.    However, Arglass production has been so far below the volume promised in the RFP that, even under its logic, Arglass would owe RBW the quarterly minimum payment of $200,000.

**RESPONSE: Denied.**

63.    Arglass has not paid any amount, including the $200,000 quarterly minimum, toward the invoices submitted on or after October 31, 2021.

**RESPONSE: Arglass admits that it has not paid a quarterly minimum payment, including because RBW was never able to successfully fulfill its**

16

obligations under the Agreement and exit the Startup Period, only at which point a quarterly minimum payment could apply.  Arglass denies any remaining allegations of ¶ 63.

### D.     The termination of the Agreement.

64.     On January 3, 2022, RBW notified Arglass that due to nonpayment of the invoices RBW was entitled to suspend services under the Agreement and warned that if payment was not received by noon on January 4, 2022, RBW would suspend performance of the Services.

**RESPONSE: Arglass admits that RBW sent a letter dated January 3, 2021 threatening to suspend services.  That letter is a written document that speaks for itself.  Arglass denies any remaining allegations of ¶ 64.**

65.     Arglass did not deliver payment as requested and on January 4, 2022, RBW notified Arglass that due to uncured payment default it was terminating the Agreement.

**RESPONSE: Arglass admits that it did not deliver payment for disputed amounts.  Arglass admits that RBW sent a termination letter dated January 4, 2022, which is a written document that speaks for itself.  Arglass denies any remaining allegations of ¶ 65.**

66.     At the time the Agreement was terminated, RBW had performed 115,273 moves for Arglass.

**RESPONSE: Denied.**

67.     Under the Agreement, RBW was to be reimbursed for the unsecured financial investment at the rate of $.0136 per pallet move for the first 6,183,734, and if the Agreement was terminated early, RBW would receive this rate for the difference between 6,183,734 moves and actual moves billed.

**RESPONSE: Arglass states that ¶ 67 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

68.     Because RBW had performed 115,273 moves by the time the Agreement was terminated, it was entitled to be paid $825,310.75 ($0.136 for the

difference between 6,183,734 and 115,273 moves).

**RESPONSE: Arglass states that ¶ 68 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

69.     Arglass has refused to pay this amount to RBW.

**RESPONSE: Arglass admits the allegations of ¶ 69 because Arglass does not owe RBW this amount.**

70.     Under the Agreement, RBW was entitled to vacate the Facility and remove the Equipment within 30 days unless Arglass opted to purchase the Equipment.

**RESPONSE: Arglass admits that under the Agreement, it had a right of first refusal to purchase the Agreement.  Arglass admits that ¶ 3D of the Agreement contains a surrender clause where "[n]o later than thirty (30) days after termination of the Agreement, RBW shall vacate the Warehouse and remove any Equipment returning the Warehouse in substantially the same condition as received."  The Agreement is a written document that speaks for itself.  Arglass denies any remaining allegations of ¶ 70.**

71.     However, Arglass informed RBW on January 6, 2022, that RBW was to vacate the Facility immediately. Arglass has declined to purchase the Equipment.

**RESPONSE: Arglass admits that it has declined to purchase the Equipment, for which it had a right of first refusal but no obligation to purchase under the Agreement.  Arglass is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 71 and therefore denies them.**

72.     Arglass has prevented RBW from gaining access to the Facility in order to remove and recover its Equipment

**RESPONSE: Denied.  To the contrary, Arglass further states that it has repeatedly invited RBW to come retrieve any remaining equipment to which it is entitled.**

73.     Since January 6, 2022, Arglass has converted supplies belonging to RBW for its own use, including 375 air bags, switches, access points, a TrippLite UPS, a chain-link fence, and one Ring security camera.

**RESPONSE: Arglass states that ¶ 73 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

## FIRST CAUSE OF ACTION
### (Breach of Contract)

74.     RBW hereby realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1 through 73 hereof as though set forth fully herein.

**RESPONSE: Arglass incorporates its responses to each and every allegation contained in paragraphs 1 through 73 hereof as though set forth fully herein.**

75.     Pursuant to the terms of the Agreement, Arglass agreed to pay certain rates for warehouse services provided by RBW.

**RESPONSE: Arglass states that it entered into the Agreement and agreed to its terms, which is a written document that speaks for itself and that is subject to all applicable law.  Arglass denies any remaining allegations of ¶ 75.**

76.     Arglass received weekly invoices between September 19, 2021, and October 24, 2021, totaling $304,165.81 and did not submit a written dispute within 30 days of receipt.

**RESPONSE: Denied.**

77.     Pursuant to the terms of the Agreement, Arglass must submit, in writing, any dispute as to the amount of an invoice within 30 days of receipt.

**RESPONSE: Arglass admits that ¶ 2 of the Agreement provides that certain disputes must be submitted in writing within 30 days.  The Agreement is a written document that speaks for itself.  Arglass denies any remaining allegations of ¶ 77.**

78.     Arglass' failure to pay the September 19, 2021, through October 24,

2021, invoices constitutes a breach of the Agreement.

**RESPONSE: Arglass states that ¶ 78 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

79.    Arglass received weekly invoices between October 31, 2021, and January 10, 2022, totaling $671,999.59. Arglass did dispute these invoices, claiming that it owed RBW at the lower Transactional Pricing rate rather than the Accessorial Charges rate charged.

**RESPONSE: Arglass admits that it disputed the referenced invoices.  To the extent that the allegations of ¶ 79 rely on statements made during compromise offers or negotiations, those are inadmissible under Federal Rule of Civil Procedure 408.  Arglass is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 79 and therefore denies them.**

80.    Yet, Arglass failed to pay any portion of the October 31, 2021, through January 10, 2022, invoices.

**RESPONSE: Arglass admits the allegations of ¶ 80 because Arglass does not owe RBW this amount.**

81.    Furthermore, pursuant to the terms of the Agreement, Arglass agreed not to offset payment of RBW invoices under any circumstances without the prior written consent of RBW.

**RESPONSE: The Agreement is a written document that speaks for itself.  Arglass invites the Court to review the entire Agreement for a complete statement of its terms.  Arglass denies any remaining allegations of ¶ 81.**

82.    RBW never consented, in writing to the offset of any payments owed to it under the October 31, 2021, through January 10, 2022, invoices or otherwise.

**RESPONSE: Arglass is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 82 and therefore denies them.**

83.    Arglass' failure to pay the October 31, 2021, and January 10, 2022,

invoices without deduction or offset, constitutes a breach of the Agreement.

**RESPONSE: Arglass states that ¶ 83 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

84.     Moreover, Arglass agreed to pay RBW at least $200,000.00 in minimum quarterly revenue for providing the Services.

**RESPONSE: Denied.  To the extent that the allegations of ¶ 84 stem from representations made during compromise offers or negotiations, those statements are inadmissible under Federal Rule of Civil Procedure 408.**

85.     Arglass' failure to pay the $200,000.00 minimum quarterly revenue constitutes a breach of the Agreement.

**RESPONSE: Arglass states that ¶ 85 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

86.     Additionally, Arglass has failed to pay RBW for the unsecured financial investment RBW undertook to finance the purchase of the Equipment.

**RESPONSE: Arglass admits that it has failed to pay RBW for the referenced amount because Arglass does not owe RBW this amount.  Arglass denies any remaining allegations of ¶ 86.**

87.     As of December 31, 2021, RBW had billed Arglass for 115,273 total moves since the inception of the Agreement.

**RESPONSE: Denied.**

88.     Under the Agreement, RBW is owed the difference between 6, 183,734 moves and 115,273 moves at the rate of $0.136 per pallet move, or $825,310.75.

**RESPONSE: Arglass states that ¶ 88 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

89.     Arglass' failure to pay $825,310.75 for the unsecured financial investment constitutes a breach of the Agreement.

**RESPONSE: Arglass states that ¶ 89 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

90.     As a direct and proximate result of Arglass' breach of the Agreement, Arglass is liable to RBW in the amount of $1,801,476.15 for its failure to pay RBW's invoices and its failure to pay RBW for its unsecured financial investment upon termination.

**RESPONSE: Arglass states that ¶ 90 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

91.     Interest accrues at the statutory rate of 18% per annum pursuant to O.C.G.A. § 7-4-16.

**RESPONSE: Arglass states that ¶ 91 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

92.     In order to perform the Services, RBW had to purchase supplies and additional equipment valued at approximately $2,935,775.79, excluding the unsecured financial investment.

**RESPONSE: Arglass is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 92 and therefore denies them.**

93.     Despite RBW's best efforts to repurpose the supplies and additional equipment, the majority of the supplies and equipment has little to no value to RBW other than for use in providing the Services at the Facility.

**RESPONSE: Arglass is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 93 and therefore denies them.**

94.     RBW's expenses incurred in complying with the Agreement are

recoverable as damages pursuant to O.C.G.A. § 13-6-9.

**RESPONSE: Arglass states that ¶ 94 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

95.     Arglass is therefore additionally liable to RBW for the damages associated with the purchase of the Equipment necessary to perform under the Agreement in an amount to be proven at trial.

**RESPONSE: Arglass states that ¶ 95 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

**SECOND CAUSE OF ACTION**
**(Account Stated)**

96.     RBW hereby realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1 through 73 hereof as though set forth fully herein.

**RESPONSE: Arglass incorporates its responses to each and every allegation contained in paragraphs 1 through 95 hereof as though set forth fully herein.**

97.     RBW has submitted invoices to Arglass in the total aggregate amount of $976,165.40 for the Services provided under the Agreement.

**RESPONSE: Arglass is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 97 and therefore denies them.**

98.     Arglass is also indebted to RBW in the amount of $825,310.75 for the payment of the unsecured financial investment.

**RESPONSE: Arglass states that ¶ 98 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

99.     There is now due, owing and unpaid from Arglass to RBW the sum of $1,801,476.15 for unpaid service invoices and arrearages, with daily amounts and

interest at the statutory rate of 18% per annum continuing to accrue.

**RESPONSE: Arglass states that ¶ 99 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

### THIRD CAUSE OF ACTION
### (Conversion)

100.   RBW hereby realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1 through 73 hereof as though set forth fully herein.

**RESPONSE: Arglass incorporates its responses to each and every allegation contained in paragraphs 1 through 99 as though set forth fully herein.**

101.   By preventing RBW from accessing the Facility following the termination of the Agreement and removing the Equipment, Arglass has converted RBW's property.

**RESPONSE: Arglass states that ¶ 101 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.  To the contrary, Arglass further states that it has repeatedly invited RBW to come retrieve any remaining equipment to which it is entitled.**

102.   As of January 6, 2022, Arglass was in possession of twenty-eight (28) pallets of airbags at the Facility, including twenty-five (25) full pallets containing 150 units each, and three (3) approximately half-full pallets with an average of 75 units each for a total of 3,975 airbags.

**RESPONSE: Arglass is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 102 and therefore denies them.**

103.   On January 6, 2022, RBW offered to leave the remaining 3,975 airbags at the Facility provided that Arglass paid RBW the invoiced amount of $43,339.11.

**RESPONSE: Arglass admits that on January 6, 2022, RBW demanded**

**$43,339.11 for airbags.  Arglass is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 102 and therefore denies them.**

104.   On January 6, 2022, Arglass, through its attorney, rejected RBW's offer to purchase the airbags from RBW and advised RBW to return the next day, January 7, 2022, to retrieve the remaining 3,975 airbags.

**RESPONSE: Arglass is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 104 and therefore denies them.**

105.   Despite the parties' mutual agreement for RBW to retrieve its property, when RBW returned the morning of January 7, 2022, Arglass Founder and CEO, Jose de Diego Arozamena, confronted and threatened RBW employees, advised that they were trespassing on private property and that he had called the authorities, and demanded that they vacate the premises immediately.

**RESPONSE: Arglass denies any wrongdoing by its CEO Mr. Arozamena and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 105 and therefore denies them.**

106.   Arglass refused to let RBW return to retrieve the 3,975 airbags until January 12, 2022.

**RESPONSE: Arglass is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 106 and therefore denies them.**

107.   Upon information and belief, from approximately January 7 through January 12, 2022, Arglass used RBW's airbags in packaging its Goods for outbound shipments.

**RESPONSE: Arglass is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 107 and therefore denies them.**

108.   On January 12, 2022, RBW employees observed Arglass personnel at the Facility filling and using the airbags in its operations.

**RESPONSE: Arglass is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 108 and therefore denies them.**

109.   On January 12, 2022, Arglass returned twenty-four (24) pallets consisting of 3,600 units of airbags to RBW.

**RESPONSE: Arglass admits that on January 12, 2022, RBW picked up twenty four pallets consisting of 3,600 units of airbags from the Arglass facility.**

110.   Arglass kept approximately 375 airbags belonging to RBW.

**RESPONSE: Arglass is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 110 and therefore denies them.**

111.   To date, Arglass has neither returned nor compensated RBW for approximately 375 airbags, which were the lawful property of RBW.

**RESPONSE: Arglass is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of ¶ 111 and therefore denies them.**

112.   Arglass has converted supplies belonging to RBW for its own use, including 375 air bags, switches, access points, a TrippLite UPS, a chain-link fence, and one Ring security camera.

**RESPONSE: Arglass states that ¶ 112 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

113.   Arglass is liable to RBW for the conversion of its property in an amount to be proven at trial.

**RESPONSE: Arglass states that ¶ 113 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

114.   Arglass's conduct showed willful misconduct, malice, fraud,

wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences and justify an award of punitive damages.

**RESPONSE**: **Arglass states that ¶ 114 purports to state a legal conclusion that Arglass is not required to admit or deny. To the extent that a response is required, denied.**

## FOURTH CAUSE OF ACTION
### (Attorney's Fees)

115.   RBW hereby realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1 through 73 hereof as though set forth fully herein.

**RESPONSE**: **Arglass incorporates its responses to each and every allegation contained in paragraphs 1 through 114 hereof as though set forth fully herein.**

116.   Arglass has failed to pay invoices it has never disputed.

**RESPONSE**: **Denied.**

117.   On other invoices, Arglass has disputed the invoices based on the rate, but has not made payment at the rate it contends RBW is entitled to receive under the Agreement.

**RESPONSE**: **Arglass admits that it disputed the referenced invoices. Arglass denies any remaining allegations of ¶ 117.**

118.   Even under Arglass' logic, payment of the invoices it did dispute in writing would fall below the minimum quarterly revenue payment established by the Agreement, in which case, Arglass would owe RBW $200,000 for the Services performed between October 1, 2021, and December 31, 2021.

**RESPONSE**: **Arglass states that ¶ 118 purports to state a legal conclusion that Arglass is not required to admit or deny. To the extent that a response is required, denied.**

119.   Yet, Arglass has not paid RBW the minimum quarterly revenue guaranteed by the Agreement.

**RESPONSE: Arglass states that ¶ 119 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

120.   Arglass has refused to pay the unsecured financial investment payment owed upon termination of the Agreement.

**RESPONSE: Arglass admits that it has not paid the referenced amount because Arglass does not owe RBW this amount.  Arglass denies any remaining allegations of ¶ 120.**

121.   In fact, Arglass CEO Jose de Diego Arozamena, has acknowledged that Arglass owes RBW under the Agreement but stated that Arglass would not be paying RBW any amount, disputed or undisputed, in order to gain additional leverage in anticipation of litigation.

**RESPONSE: Denied. To the extent that any allegations in ¶ 121 stem from compromise offers or negotiations, such are inadmissible under Federal Rule of Civil Procedure 408.**

122.   Arglass has intentionally converted property belonging to RBW.

**RESPONSE: Arglass states that ¶ 122 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

123.   Arglass has acted in bad faith, been stubbornly litigious, and caused RBW unnecessary trouble and expense. Pursuant to O.C.G.A. § 13-6-11, RBW is entitled to recover its expenses of litigation incurred in bringing this action.

**RESPONSE: Arglass states that ¶ 123 purports to state a legal conclusion that Arglass is not required to admit or deny.  To the extent that a response is required, denied.**

## AFFIRMATIVE DEFENSES

Arglass reserves the right to raise any additional defenses allowed by law as

evidence is discovered in pursuit of this litigation. Without waiving any of the

foregoing defenses and without assuming the burden of proof for any defense for which RBW has the burden, Arglass states the following affirmative defenses:

### FIRST DEFENSE

RBW fails to state a claim for which relief can be granted.

### SECOND DEFENSE

RBW is responsible in whole or in part for the damages it seeks.

### THIRD DEFENSE

RBW failed to comply with the terms of or with conditions precedent in the Agreement.

### FOURTH DEFENSE

RBW failed to mitigate its damages.

### FIFTH DEFENSE

RBW's claims are barred by the economic loss doctrine.

### SIXTH DEFENSE

RBW's claims are foreclosed by the Agreement's entire agreement clause.

### SEVENTH DEFENSE

RBW is estopped from claiming the damages it seeks.

## EIGHTH DEFENSE

RBW's claims are barred by waiver.

## NINTH DEFENSE

RBW's damages are precluded in whole or in part due to RBW's defective performance or breaches under the Agreement.

## TENTH DEFENSE

RBW's claims are barred, in whole or in part, by unclean hands.

## ELEVENTH DEFENSE

Some of RBW's claims are barred by Georgia public policy, which does not enforce contractual penalties.

## ARGLASS'S COUNTERCLAIMS

### Preliminary Statement

Arglass hired RBW for its claimed expertise in providing independent, successful, and cost-effective warehouse management services.  Indeed, RBW touts on its website that they, "are a group of creative logistics experts that deliver results that matter."  But, in reality, RBW failed to live up to its promises, failed to use due care in performing the necessary services, and failed to meet its obligations under the Agreement.  Despite heavily staffing the warehouse for more than six months, RBW was never able to successfully implement the Automated Guided

Vehicles ("AGVs") at the heart of the Agreement.

Even worse, RBW's persistent negligence, incompetence, and errors cost Arglass the loss of a major supply contract, disrupted Arglass's relationships with its customers, led to inefficiencies and frustrations in the warehouse, and caused damage to the facility, supplies, and goods.  Arglass does not owe RBW hundreds of thousands of dollars of fees that applied only to contractual phases that RBW never reached.  Nor does Arglass owe hundreds of thousands of dollars in wildly excessive charges for incompetent manual labor for which RBW bilked Arglass when RBW was unable to achieve the automation for which the parties bargained.  Rather, RBW owes Arglass because, among other problems, its botched warehouse "management" caused Arglass to lose a multi-million contract with Diageo to produce its Smirnoff Ice bottles.  RBW's incompetence stands in stark contrast to the efficiency and organization of operations in the warehouse now that it has left.

A.    **Arglass Confirms Its Warehouse Management Needs in Its RFP, and RBW Promises That It Can Deliver.**

1.    On or around February 2, 2021, Arglass issued a request for proposal ("RFP") for third party service providers to install and operate managed warehouse operations at Arglass' state-of-the-art glass container manufacturing facility in Valdosta, Georgia.

2.    As requested in that document, the warehouse operations service provider was "expected to handle all aspects related to the movements of all

31

materials in the warehouse including truck loading and unloading."  In other words, Arglass sought an expert warehouse manager to independently provide these services.

3.      Arglass' RFP and its discussions with prospective vendors made clear that the warehouse operations service provider would use its own equipment and systems and that the services would be provided by unmanned, automated guided vehicles ("AGVs").

4.      Arglass' RFP also stated that the warehouse operations service provider was to be responsible for "[i]nstallation and operation of all warehouse equipment including the programming, managing and maintenance of AGVs and other equipment."

5.      The RFP further provided that the warehouse operations service provider was responsible for installing and operating a Warehouse Management System (WMS System) "compatible with Arglass' Infor ERP."

6.      RBW responded to Arglass' RFP and promised it could accomplish those goals.  On February 5, 2021, RBW Chief Operating Office Bob Willert introduced RBW as exceptional "logisticians, strategy suppliers, supply chain engineers, [and] trusted friends" that could provide excellent customer service and operational performance.

7.      During pre-contract negotiations, RBW claimed that it had extensive

experience in warehouse operations for manufacturing facilities.

8.    Bob Willert specifically touted to Arglass that RBW was providing services with similar requirements to several other customers, including Kimberly Clarke, Prayon, and Allnex.

9.    During the contract negotiations, Arglass made it clear that it was relying on RBW—as the purported warehouse management expert—to fully control the warehouse and shipping operations, including all requirements to get the AGVs operational and integrated with Arglass' systems.

10.   For example, the parties discussed the possibility of RBW using radio frequency identification ("RFID") to communicate between RBW's AGVs and Arglass's pallets.  On or around April 21, 2021, RBW's Chief Technology Officer Tony Calabrese inquired if the RFID costs would be absorbed by Arglass or if those costs should be "include[d] . . . in the cost of our buy out." Arglass's VP of Technology Jason Buxton responded to Mr. Calabrese's email that, while Arglass had the capabilities for it to use RFID for Arglass's needs, if there was anything "related to use/integration with WMS or AGVs," those costs should be borne by RBW, not Arglass.

**B.    Arglass and RBW Execute a Detailed Master Services Agreement Confirming RBW's Responsibilities to Achieve a Successfully Automated and Independently Managed Warehouse.**

11.   RBW and Arglass entered into a Master Services Agreement on June

1, 2021.

12.     The Agreement specified that RBW would provide "warehouse management services for Arglass' finished goods, packaging and transport materials, and other materials" (defined as "Services") at Arglass's state-of-the-art glass container production facility.

13.     RBW committed to "take over the warehouse management responsibilities for all Goods for Arglass," including loading and unloading, shipping and receiving as well as internal movements within the warehouse. MSA, Ex. A ¶ 4.1. Under the Agreement, RBW was also responsible for receiving and delivering Goods from and to Arglass's production area. MSA ¶ 7(A).  And RBW was responsible for the integration of these functions with Arglass' system to allow for efficient and smooth operation.

14.     Exhibit A to the Agreement ("Description of the Services") outlines specific Services for which RBW was responsible.  For example, Section 4.2 provides for "Production Support Services," which are to be provided "continuously and uninterrupted for 24 hours a day every day of each calendar year." RBW's tasks for Production Support Services included "[d]elivering all Materials necessary for packaging and conveying the Products . . . to the production staging area," "AGV pick up full pallets with Products in bulk from the end of the glass production lines" and placing them elsewhere, and if needed,

placing pallets "in a specific area on hold pending secondary inspection."  MSA, Ex. A ¶ 4.2.

15.     The Agreement also provides for an "RBW Designated Warehouse Area."  This area was RBW's domain.  RBW was to be fully responsible for staffing, maintaining, organizing, and managing the Services in this Area.

16.     Section 4.3 of Exhibit A describes certain "Warehouse Operations" services, which RBW had to provide "continuously and uninterrupted for 16 hours a day on workdays for 52 weeks each calendar year."  RBW's responsibilities included delivering full pallets and materials to the case packaging and decoration areas, picking up pallets from the case packing and decorating area, and staging pallets for shipping.

17.     Warehouse Operations also included maintaining all inventory.  RBW was responsible for "[m]aintaining all inventory in proper order and condition . . . while operating under First-In First-Out (FIFO") rules," controlling all inventory and "promptly communicat[ing] to Arglass any issues or problems," providing Arglass with "real-time tracking of all items in inventory in the warehouse," and providing Arglass with "real-time access to see and monitor . . . all movements" of inventory and to provide Arglass with regular reports of activity. MSA, Ex. A ¶ 4.3.

18.     Arglass works directly with its customers to produce and supply

goods on a continuous basis, which means that having real-time access to inventory was vitally important to Arglass' sales and business relationships.

19.    In addition to Production and Warehouse Services, RBW committed to perform services related to "Shipping & Receiving Operations" "continuously and uninterrupted" during the business week. RBW's responsibilities included receiving inbound Materials, loading finished glass product, including "making sure that the cargo is properly secured," "[p]roviding all dunnage materials," maintaining records of the dunnage material used, and preparing the necessary shipping documents.  RBW was also responsible for scheduling shipments and staging the goods for efficient ship outs.

20.    Importantly, the Agreement required that RBW make sure that "all Products and Materials are moved under FIFO rules."

21.    In addition, for food and safety reasons, maintaining inventory according to FIFO was critical to Arglass and its customers.

22.    The Agreement contemplated that many of RBW's responsibilities would be performed through the use of automated guided vehicles (also known as "AGVs").  RBW was required to "provide and use automated equipment and systems with the minimum capabilities described in Exhibit C, all of which shall be owned by RBW (the 'Equipment') to provide the Services." MSA ¶ 1.

23.    RBW and Arglass agreed to certain rates and fees for the Services.

These rates were based on an understanding, as outlined in the contract, that RBW would perform the Services using AGVs.

24.     For example, the Agreement states that "AGVs will be utilized to deliver Goods from Arglass' production line to the RBW Designated Warehouse Area without any human verification" or inspection.  MSA ¶ 17(B).  And the Agreement also provided that "RBW will use AGVs for a majority of the pallets moves within the facility." MSA, Ex. A ¶ 15.

25.     Arglass recognized that, as of June 1, 2021, the systems and Equipment to provide the Services as contemplated by the parties' pricing schedule were not fully operational and so agreed to a time-limited "Startup Period." It was RBW's obligation to get the AGVs up and running during this period.

26.     The Agreement provided for an eight-week Startup Period.  During the Startup Period, the parties agreed to meet on a weekly basis to agree on the level of services required for the following week.

27.     Under the Agreement, during this limited Startup Period, RBW would invoice Arglass for "all mutually agreed Services" at the special hourly rates specified in the "Accessorial Charges" provision of the Agreement.

28.     The "Accessorial Charges" term provides inflated rates for manual labor.  For example, RBW would charge Arglass $33.25/hour for warehouseman labor, $59.75/hour for forklift operator labor, and $85.42/hour for the Operations

Manager.  While manual labor was necessary during the Startup Period, that model was the opposite of the automated environment for which the parties contracted in the Agreement.

29.    Arglass did not agree to pay these inflated rates other than during the Startup Period and for specific services performed at Arglass's request for mutually agreed activities "above and beyond the normal scope of work."  MSA, Ex. A ¶ 13.

30.    The Agreement further provided that the "end of the Startup Period shall signify the transition from hourly rates to the Transactional Pricing" set forth in Section 13 of the Agreement.

31.    The subsequent transactional pricing model—which RBW was never able to reach—was based on costs for "per pallet move[s]."

32.    Near the end of the initial 8-week period, the parties further agreed to extend the Startup Period through September 2021.

33.    The Agreement requires that the cost of services under the Accessorial Charges schedule be presented to and approved by Arglass by purchase order *before* RBW performed those services.  MSA, Ex. A ¶ 13.

34.    After the Startup Period, the Agreement required that Production Support and Warehouse Operations Services "are to be provided by the exclusive use of Automated Guided Vehicles (AGVs), with manned forklifts only to be used

as emergency backup."  MSA, Ex. A ¶ 6.

35.     Per the Agreement, RBW was responsible for getting the AGVs operational and integrated with Arglass's systems.

36.     Specifically, the Agreement required RBW, not Arglass, to provide the "right level of IT infrastructure (hardware and software) to provide the services and communicate with Arglass' systems in a seamless and efficient manner." MSA, Ex. A ¶ 6.

37.     The Agreement required RBW to "[m]aintain current and accurate electronic systems."  MSA Ex. A ¶ 11.1.

38.     The Agreement also required RBW to "[i]nstall and maintain the necessary IT systems and infrastructure to provide the Services, including maintaining a real-time exchange of information with Arglass' IT systems" and with the "Decoration and Corrugate service providers operating within the Arglass warehouse."  MSA, Ex. A ¶ 11.1.

39.     As a condition of providing the services, the Agreement required RBW to provide "the integration of communication of information with Arglass' own information systems and equipment."  MSA, Ex. A ¶ 4.1.

40.     The Agreement also required RBW to "manage all data relating to warehouse activities."  MSA Ex. A ¶ 4.11.

41.     The parties agreed that the Agreement could not be modified except in

writing duly signed by both parties.  MSA ¶ 23(A).

**C.**     **RBW's Performance Fell Far Short of Its Contractual Obligations.**

42.     On its website, RBW claims "[i]f there was one thing that we know how to do well, it's manage a warehouse."  But, in Arglass's experience, RBW was not even able to do that, even using manual equipment.

43.     From the very first invoice, Arglass expressed concern about the resources and expenses needed to manually staff the warehouse, which was neither what Arglass bargained for nor the purpose of the Agreement.

44.     Throughout the parties' relationship, Arglass consistently expressed concern about the mounting costs, inefficiencies, and ineffectiveness of RBW's purported "services" to Arglass.  Arglass was in constant contact with RBW regarding problems in RBW's physical and system warehouse management.

45.     For example, on September 1, 2021, Arglass CEO Jose de Diego Arozamena emailed RBW CEO Frank Anderson and COO Bob Willert to express serious concerns with RBW's WMS system.  In short, the system did not allow for the traceability of product.  Among other problems, the software would record pallets but would leave the pallet dates or times blank, would scan in product without appropriately scanning in the license plate number, and would record partial pallets instead of full pallets.

46.     Mr. Arozamena's email was clear that these problems had to be fixed

immediately, as Arglass was about to ramp up production and increase outbound shipments, and the issues with traceability would only grow.

47.    Indeed, those problems started to mount just a few days later.  On September 8, 2021, Mr. Arozamena had to again alert RBW to numerous issues that needed "urgent" attention, including physical and system inventory problems.

48.    One issue identified in that September 8, 2021 email was that, after RBW claimed that there was no Bulleit Bourbon 700 that it could send to be cased, 40 pallets of the product were magically found in the warehouse.  RBW had never entered those pallets into its WMS.

49.    As a result of RBW's negligence, Arglass (through its wholly owned subsidiary, TSCC) was not able to promptly case the product.  This caused Arglass to miss scheduled shipments and incur in-line downtime costs.  And because there would often be several hours of delay in RBW picking up product after it had to be cased, TSCC had to use its own personnel to move pallets away from production so as not to clog the lines.

50.    The September 8th email also identified variances in inventory, including the disappearance of 127 pallets of Smirnoff Ice, 61 pallets of Bulleit Bourbon 750, 16 pallets of Bulleit Bourbon 1000, and 118 pallets of Mobius 1000.

51.    A pallet contains between 1,440 and 4,732 bottles (depending on bottle size). Arglass hired RBW as its warehouse manager so it could have

accurate inventory records—not be off by hundreds of thousands of bottles.

52.    RBW was consistently unable to provide simple, accurate current inventory levels.

53.    RBW also failed to appropriately record the bulk glass pallets produced in its own WMS, causing large variances between Arglass's actual production data and RBW's warehouse data.

54.    And the September 8th email identified issues with the way RBW was storing product in the warehouse.  RBW stacked pallets of different product on top of one another and failed to store the same product in the same area of the warehouse.  Such commingling of product was an ineffective way to control inventory to avoid mistakes, and it made it impossible for RBW to comply with its contractual obligation to ship product according to FIFO.

55.    Many of these problems may have stemmed from a fundamental lack of organizational skills.  RBW failed to appropriately mark the warehouse and/or train its employees in appropriate organizational techniques to follow FIFO inventory management.

56.    In addition to these issues, RBW did not take reasonable due care to move, stack or align pallets of glass, causing numerous instances of broken and damaged ware and further causing delays and problems in inventory management and shipping operations.  RBW's carelessness also caused significant damage to

the pallets themselves.

57.    RBW's lack of due care also caused health and safety issues in the warehouse.  On at least one occasion, RBW personnel stacked pallets in front of the fire extinguisher, which was a fire safety hazard.  On more than one occasion, RBW forklift operators also ran into warehouse support columns, causing direct damage to Arglass' property.

58.    Upon information and belief, RBW did not even have standard operating procedures for how to run and manage the warehouse.

59.    RBW also failed to appropriately staff the warehouse.

60.    Arglass personnel often witnessed RBW employees slacking off on the job.  Although billed out at exorbitant hourly rates, RBW workers could be seen playing on their phones, hiding in the lanes of the warehouse, sleeping on the job, and watching movies.

61.    In short, the warehouse was a mess, even leaving aside RBW's inability to bring the AGVs into operation. And RBW lacked the organizational and system tools to fix the problems of its own making.

62.    These problems also expanded beyond the physical warehouse. RBW experienced significant issues with its WMS.  RBW was unable to provide Arglass with real time information about inventory.  RBW failed to scan product into the WMS.  And the WMS would show phantom pallets in the warehouse, even though

they did not exist.

63.     And despite touting itself as an experienced manager with the competence to ship out product, RBW routinely made consequential errors. RBW would ship the wrong loads. RBW would often send the wrong paperwork with the trucks, including identifying the wrong product on the bill of lading, would ship product that had never been entered into its WMS system, and would ship product that had been placed on hold in the system.  RBW frequently did not ship product according to FIFO.  RBW's struggles to efficiently load trucks caused delays and led to increased detention charges.

64.     RBW also failed to properly communicate with Arglass. RBW would not timely enter shipments into the WMS, causing discrepancies with inventory and leading to problems in invoicing customers.  RBW also failed to communicate with Arglass when trucks were short shipped.

65.     Arglass consistently informed RBW of the need to ship product according to FIFO.  For example, on August 31, 2021, Arglass' Head of Supply Chain, Joe Luna, told the RBW team that we need to work "FIFO 100%" in perfect pallet sequence and that Arglass's largest customer, Diageo, requested that the only deviations from this system be product that had been placed on hold (and thus was ineligible to be shipped). Importantly, Arglass had to be able to explain to Diageo each and every pallet that was missing from the sequence.

44

66.     This email reiterated the same thing that Mr. Arozamena had communicated to RBW's Bob Willert the day before.

67.     Eight days later, and seeming not to understand the requirements of FIFO, RBW's Aaron Ferguson responded and asked if Arglass meant that the pallets had to be picked in sequential order without a grace period.  Mr. Luna responded that day and confirmed that "[t]he way it comes out of our production line is in perfect sequence so we need to follow that when we ship out."

68.     Again on September 21, 2021, Mr. Arozamena informed RBW's Tony Calabrase that FIFO was vital for "food safety standards, customer requirements, and our requirements. This is not optional."  And that the only version of FIFO was by pallet number, as that is how product was received into the warehouse.

69.     In one consequential example of RBW's gross negligence and incompetence, RBW shipped truckloads of bad ware to one of Arglass' main customers. Between October 4, 2021 and October 7, 2021, RBW shipped fourteen truckloads of Smirnoff Ice glass bottles to Diageo.  Approximately 40% of the product in the truckloads should not have been shipped to Diageo at all because they had already been flagged due to quality issues.

70.     RBW negligently shipped 20 pallets that were clearly marked as "ON HOLD" in the WMS. RBW also shipped products that were either not properly

entered or were never entered into the WMS.

71.    In addition, RBW negligently loaded the trucks causing high date spreads within single truckloads and leaving older pallets in the warehouse.

72.    Had RBW followed FIFO (as the Agreement mandated) the ware with quality issues would have been confined to the last few truckloads, instead of being spread out among the 14 truckloads.

73.    Because the bad ware could not be easily isolated and contained, Diageo rejected all 14 truckloads of ware.  And Diageo terminated its deal with Arglass to supply the Smirnoff Ice bottles.

74.    And even after the Diageo mis-shipment and after Arglass warned that there could not be any further mistakes, RBW continued to commit critical failures in basic shipping operations.

75.    For example, on or around October 21, 2021, there were errors in syncing the WMS to physical shipments. That same day, RBW prepared a bill of lading with the wrong item list, showing entirely different product than what was loaded on the truck. And RBW physically shipped order 180-13 with 26 pallets, but experienced system issues in loading that order to the WMS.

76.    The cumulative impact of RBWs errors became clear during a mid-November review of product performance.  Arglass CEO Mr. Arozamena wrote to RBW and the Arglass sales team on November 15, 2021 that while *production*

performance was matching Arglass's target trends, its *ship-out* was significantly behind, more than $782,000 behind target.  Arglass had the demand, but it was rapidly building inventory because RBW could not get the product out the door.

77.     According to Mr. Arozamena's email, RBW would need to ship 23 trucks every day through the rest of the month to catch up to the target.

78.     But RBW proved incapable of performing at such a rate.  On average, RBW was clearing only 10-12 trucks/day.

**D.     RBW Failed at the Central Purpose of the Agreement.**

79.     On top of RBW's many warehouse operational issues, RBW failed to meet its contractual obligations to get the AGVs up and running during the extended Startup Period.

80.     Even though the AGVs should have been fully operational by the end of the extended startup period, RBW continued to invoice Arglass for "Startup charges" from October 1, 2021 to January 18, 2022.

81.     Arglass notified RBW that such charges were not in accordance with the parties' Agreement and sought in good faith to work with RBW to align the reality that RBW was not ready or able to operate the AGVs by the end of the extended Startup Period to the mounting costs of manually operating a warehouse under an Agreement that was not designed for manual operations.  But RBW rejected such responses and continued to invoice Arglass at the inflated manual

labor rates.

82.     Initially, RBW represented that the AGVs would be equipped with RFID readers. Months later, RBW made the decision to use barcode readers instead of RFID technology on the AGVs.

83.     But RBW did not even order the necessary hardware to scan or read the labels for using the AGVs until November 1, 2021. That was five months after the parties' Agreement had begun and two months after the extended Startup period had ended. And even then, RBW estimated that the AGVs would not be operational until mid-February, over a year and a half since it had agreed to perform the Services.

84.     RBW did not even physically assemble the AGVs.  The AGVs sat unassembled in the warehouse until December 2021.

85.     On November 11, 2021, Arglass CEO Mr. Arozamena sent a Notice of Default to RBW's CEO Frank Anderson.  This letter outlined specific examples of RBW's default, including, but not limited to issues with the AGVs and billing, operational issues, and shipping issues.

86.     RBW responded on November 30 and concluded that "all operational issues raised in your November 11th notice of default have been resolved."

87.     But RBW's performance still did not improve. On November 21, 2021, RBW shipped two truckloads with the same bill of lading (#171-13).  To add

to the confusion, one version of the bill of lading was for 26 pallets and the other was for 13 pallets. On December 4, 2021, RBW experienced multiple problems in shipping product of Southern Comfort.  According to an analysis by RBW's Derick Aiken, RBW was "[n]ot able to receive pallets from TSCC into RBW WMS," was "[n]ot able to pick pallets to the shipment order to produce an accurate WMS BOL and LPN sheet," and the bills of lading were "not shipped in WMS real time."  According to his calculations, over 20 labor hours were spent to get the trucks loaded and the "issues still aren't resolved."

88.     On January 3, 2022, RBW sent Arglass a letter threatening to immediately suspend services.  The next day, January 4, 2022, RBW sent Arglass a formal notice of termination.

89.     And in the middle of the day on January 6, 2022, RBW walked out of the warehouse, packing up their office supplies and taking the keys to the forklifts with them.

90.     Arglass' warehouse and shipping operations have been significantly more productive and efficient without RBW than with RBW.  Since RBW left, Arglass has been able to ship out nearly double the amount of goods with half the personnel, and at significantly less cost.

91.     Thankfully, once RBW departed, Arglass was able to increase the pace of shipping to match better production, increasing outbound shipments to

between 22-30 trucks/day.

## COUNTERCLAIM COUNT I: BREACH OF CONTRACT
### (Operational Issues)

92.     Arglass incorporates the allegations of paragraphs 1 through 91 as though they were fully stated herein.

93.     RBW was contractually required to use AGVs in its provision of services and failed to do so.

94.     RBW also contractually committed to provide the Infor WMS Software.

95.     RBW was contractually required to provide the right level of hardware and IT support to provide the services and to communicate with Arglass's software.

96.     And it was RBW's responsibility to provide the right Equipment to provide the services, including whatever was necessary for the AGVs to read the pallet labels.

97.     Later in time, RBW made the decision to use barcode readers instead of RFID technology on the AGVs.

98.     RBW did not even buy the necessary barcode readers until November 1, 2021.  And such readers would not be operational until mid-February 2022, which was over a year and a half after the parties' entered the Agreement.

99.     RBW's failure to use AGVs caused damages to Arglass, including

increasing the cost of services invoiced by RBW, decreasing reliability, and increasing warehouse delays. This in turn limited Arglass's productivity and reduced its profits.

100.   RBW further breached the Agreement by charging Arglass above-market manual labor fees for subpar, non-automated performance outside of the contractually agreed upon startup period.

101.   RBW was never able to fulfill its contractual obligations to provide the right level of hardware and IT support to provide the services or to communicate with Arglass' systems.

102.   RBW also breached the agreement by charging Arglass at the Accessorial rates even though these proposed services were not presented to and approved by Arglass via purchase order prior to RBW performing the services.

103.   Arglass has been damaged in an amount to be determined at trial.

104.   In addition to RBW's failure to use the appropriate method of providing services, RBW was negligent in providing the services via manual operations.

105.   RBW's negligence resulted in widespread inventory mismanagement.

106.   RBW scattered products in numerous locations with mixed dates throughout the warehouse. RBW was also unable to account for inventory, either physically or in their WMS system.

107.   RBW also could not keep pace with Arglass's operations, causing downtime and delays in production, packaging, and shipping of product.

108.   RBW failed to use due care in moving materials, resulting in damaged goods and supplies.  RBW's failure to use due care also caused damage to the facility, including damage to dock doors, support posts, and conveyors.

109.   RBW failed to use due care in maintaining reliable information management.  For example, RBW could not timely and accurately track pallets on hand in the Warehouse Management System.

110.   RBW also failed to use due care in recording pallets in the warehouse management system.

111.   RBW's negligence meant that Arglass was unable to timely convert bulk pallets to cased pallets.

112.   RBW failed to use due care to timely remit bills of lading to Arglass, causing delays in invoicing customers.

113.   RBW is liable to Arglass for these damages, in an amount to be proved at trial.

### COUNTERCLAIM COUNT II: BREACH OF CONTRACT
### (Smirnoff Ice Supply)

114.   Arglass incorporates the allegations of paragraphs 1 through 91 as though they were fully stated herein.

115.   RBW was contractually required to monitor inventory, quarantine

product that was on hold, and to follow FIFO.

116.   Arglass manufactures glass bottles for international and national distribution.

117.   Arglass and Diageo have an ongoing business and contractual relationship, whereby Arglass supplies Diageo with glass containers for use in its alcoholic beverage supply business.

118.   Based on the parties' relationship, Diageo committed to a test run for Arglass to supply Smirnoff Ice bottles, with the ultimate goal to include Smirnoff Ice as a continuous part of the parties' relationship.

119.   Arglass invested time and money into configuring its operations to produce the Smirnoff Ice bottles, including buying special molds to produce the 11.2oz glass bottles.

120.   Under the Glass Supply Agreement between Diageo and Arglass, Diageo would provide regular forecasts of its Product requirements to Arglass.

121.   In May 2021, Diageo provided a forecast that it would need 30 million bottles of Smirnoff Ice in 2021, with an initial tranche of 10 million bottles.

122.   On or around July 7, 2021, Diageo placed a purchase order for 10 million Smirnoff Ice bottles at a net price of $153.17 per 1,000 bottles.

123.   For food health and safety reasons, as a supplier of glass bottles to Diageo, Arglass must ship according to FIFO whereby the oldest product in the

warehouse leaves first with subsequent shipments consisting of newer ware.

124.   Arglass consistently communicated the FIFO requirements to RBW.

125.   Between October 4, 2021 and October 7, 2021, fourteen truckloads, or 280 pallets, of Smirnoff Ice glass bottles were shipped to Diageo.  Out of the 280 pallets, 111, or approximately 40% of the product, should not have been shipped to Diageo at all due to quality issues.

126.   RBW negligently shipped 20 pallets that were clearly marked as "ON HOLD" in the WMS.

127.   RBW also shipped products that were either not properly entered or were never entered into the WMS.

128.   In addition, RBW failed to follow procedures and negligently loaded the trucks causing high date spreads within single truckloads and leaving older pallets in the warehouse.

129.   Had RBW followed FIFO (as it was contractually required to do) the ware with quality issues would have been confined to the last few truckloads, instead of being spread out among the 14 truckloads.

130.   Because the bad ware could not be easily isolated and contained, Diageo rejected all 14 shipments of ware, which cost Arglass at least $400,000 in ware that would have otherwise been acceptable.

131.   Arglass CEO Jose de Diego Arozamena provided written notice of

this mis-shipment to RBW's CEO Frank Anderson and COO Bob Willert on October 12, 2021.

132.   Given the shipping error, Diageo cancelled its deal with Arglass for Arglass to produce and supply bottles of Smirnoff Ice.

133.   RBW is liable for the full amount of the damages Arglass suffered for the loss of this supply, in an amount to be proven at trial.

## COUNTERCLAIM COUNT III: ATTORNEYS FEES & EXPENSES OF LITIGATION

134.   Arglass incorporates the allegations of paragraphs 1 through 91 as though they were fully stated herein.

135.   RBW failed to perform its obligations under the contract and continually invoiced Arglass at different and higher rates than contractually agreed. Even after Arglass informed RBW that such rates were not what the parties agreed to, RBW refused to work with Arglass to change or correct its billing practices.

136.   RBW has acted in bad faith, been stubbornly litigious, and caused Arglass unnecessary trouble and expense.  Under O.C.G.A. § 13-6-11, Arglass is entitled to recover its expenses of litigation, including attorneys' fees.

## PRAYER FOR RELIEF

For the above reasons, Arglass respectfully prays that it is entitled to:

(a)   Judgment against RBW and in favor of Arglass in an amount to be determined at trial;

(b)   Pre and post-judgment interest;

(c)   Attorneys' fees and costs under O.C.G.A. § 13-6-11;

(d)   Such other and further relief as the Court deems just, proper and

equitable.

Respectfully submitted, this 30th day of June, 2022.

BONDURANT, MIXSON & ELMORE, LLP

*/s/ Frank M. Lowrey*
Frank M. Lowrey IV
Fredric J. Bold, Jr.
Megan E. Cambre
1201 W. Peachtree Street, NW
Suite 3900
Atlanta, Georgia 30309
Telephone (404) 881-4100
Facsimile (404) 881-4111
*lowrey@bmelaw.com*
*bold@bmelaw.com*
*cambre@bmelaw.com*

*Attorneys for Defendant Arglass Yamamura SE, LLC*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this day, I have electronically filed the foregoing

**<u>ARGLASS YAMAMURA SE, LLC'S ANSWER, DEFENSES, AND</u>**

**<u>COUNTERCLAIMS</u>** via CM/ECF, which will cause a copy to be sent to all

counsel of record.

This 30th day of June, 2022.

*/s/ Frank M. Lowrey*
Frank M. Lowrey IV
